B.P. Exploration & Production, Inc. v. Claimant ID 100-something Mr. Robinson. Good afternoon, Your Honors. May it please the Court, I'm John Robinson from Arnold and Porter, and I represent B.P. In two recent cases, what I'll refer to as the Foundation case and the Basketball Team case, this Court has reversed and remanded for the District Court to consider, in the first instance, whether an award under the Deepwater Horizon Settlement Program complied with the standards that this Court set forth in the David West and Electrical Transformer cases. This Court should do the same for the District Court to address two questions. First, whether the Settlement Program erred by issuing an award to a claimant who did not suffer a loss within the meaning of David West, and second, whether the Settlement Program erred in failing to investigate a claimant's attestation even though that attestation is at a minimum suspicious and there is credible evidence here of a sole superseding cause, which this Court in the Electrical Transformer case said may warrant further investigation. So first, on the issue of loss, this Court should vacate and remand for the District Court to consider whether a claimant can establish a loss within the meaning of David West. Here, as in West, the claimant entered into a contract before the spill that specified that the claimant would be paid a fixed sum of money, $51 million. As in West, the claimant received everything that it was promised under that contract. While the Settlement Program's formulas yielded an award for both West and for Johnson Brothers here, this was only because their contracts were structured so that the claimants happened to earn different amounts of money at different points under the contracts. Now, listen, their claim is that they were able to get the $51 million contract amount versus what they would have had to spend but for the spill. Isn't that their claim? That's their claim and that's a difference between this case and West, but let me explain why, for a few reasons, that's not a difference that matters. So first of all, the standard that this Court has articulated in Electrical Transformers and then both the Foundation case and the basketball case, which all came after the appeal panel in the District Court had an opportunity to review this case was whether the attestation gives rise to suspicion or whether there's credible evidence of a sole superseding cause. And even if that's their claim, because this claim is so similar to West, it at least gives rise to suspicion. Second, if that's their claim, it hasn't been developed. The claims administrator has never had an opportunity to investigate it, which this Court in Deepwater Horizon 3 said should happen in the cases of suspicious attestations. So they'll have every opportunity on remand to make that case if that's a case that they think they can make, but it hasn't been addressed yet by either the District Court, the appeal panel, or the claims administrator. The other thing I'd say is... So their claim was, it cost me more to get the $51 million? That's their claim. And they offered no evidence in support of that claim? Exactly. Exactly. It's just their attestation that they lost money. Did they give you a number? Exactly. Did they give a figure on what they lost? So they haven't given a figure in their briefing, and if you look at their opposition brief, they make these assertions, but they don't cite any evidence in the record. We do have their P&L statements in the record, but what they reveal is the opposite of what they're asserting in their briefs. So for them to rely on the fact that their expenses were they would have to show that their expenses, their costs, went up in the period closest to the spill, and they did just the opposite. They were lower in the compensation period than they were in the period post-spill that they used as a reference point. So it's totally inconsistent with the theory that they're asserting for the first time on appeal here, and that's why this is a suspicious attestation that the claims administrator should take a look at. But you're saying that they haven't specified an amount of loss? It's not just that they haven't specified an amount. It's that they haven't ... Sir, I just want to answer my question. My question is no. They've given you no number. They haven't given us any number. We can look at the P&Ls that are in the statement to see the numbers, so I just don't want to misrepresent what's in the record. What do you mean you can look? That means you haven't? No. I have, and they show that their expenses went down by $3 million in the years ... their variable expenses in the year immediately following the spill. So it's just inconsistent with the theory that the loss here is attributable to their costs. The reason why the settlement formulas happened to ... What loss? Exactly. You're telling me what they showed you didn't show any loss at all? Exactly. Their purported loss. Now the only sense in which ... But you don't have a number for this purported loss. Well, the settlement program yielded a loss of $2.5 million, and the only reason it generated this quote-unquote loss, which again is a fictional loss. There was no real loss here from our perspective. Somebody came up with a number, though. Right. You can run the numbers through the formula, and you will get a compensation amount, let's call it. The reason why the formulas will yield that amount is simply because they received more revenue toward the end of the project in 2011 and 2012 than they did when the project began in 2009 and 2010. That's the only reason. Just like in West, his contract was front-loaded. So he was earning more money in 2009 before the spill than he did in 2010. And in this case, in a sense, the contract was back-loaded. The claimants were receiving more revenue in 2011 and 2012. That's the only reason. And again, in fairness to the district court and the appeal panel, they did not have the benefit of West or Electrical Transformers when it reviewed this case. David West came out on March 19, 2019. I'm sorry, the district court denied discretion to review on March 19, 2019. And David West was decided the very next day on March 20, 2019. Electrical Transformers, in which — But his claim was different from this claim, wasn't it? The claimant's case is — David West's claim was different from the claim made in this case. Well, again, there is a difference, only in the sense that here — You're not saying it cost me more to get what I agreed to get. Right. That's not — that's the claim in this case, though, isn't it? Right. And for the reasons I was discussing before, it's — that's not a difference that matters for purposes of either the loss requirement or the attestation requirement. And so what this court has done in similar cases, in the basketball team case and the foundation case, is it has reversed and remanded for the district court to address these two questions in the first instance. And that's all we're asking for here is a remand. In the foundation case, the district court took that case on remand, looked at it. That's done now with the claims administrator. So we will soon be getting guidance from the claims administrator on what the claims administrator thinks is appropriate in these cases. We'll also have guidance from — from the appeal panel. There are at least three other cases pending before this court where these issues, these legal issues, attestation and loss are being — are being raised. So we will have guidance on these questions soon. But what this court has done in two very similar cases has said that the appropriate thing to do is — is reverse and remand. And just to — just to get into briefly about how similar those cases are, in the foundation case, the settlement program awarded $20 million to a nonprofit organization after it received a one-time $20 million donation in 2009. BP argued that the foundation could not attest to a loss caused by the spill because there was no nexus between the oil spill and the $20 million loss. This court reversed and remanded for the district court to consider in the first instance whether the claim could satisfy the standards set forth in West and electrical transformers. Similarly, in the basketball team case, BP argued that the claimant could not plausibly attest to a loss because the claimant's purported losses were due simply to the fact that the team had made the playoffs in the two years prior to the spill and then didn't make the court. And at a minimum, uh, the court should do the same here. Now one of the other distinctions that I expect, um, counsel on the other side to — to try and draw between this case and the West case is that West, uh, was under the individual economic loss framework, whereas this is a business economic loss framework, uh, claim, or actually a startup business economic loss claim. Um, but as we explain in our brief, uh, the claimant ignores the fact that these two sections of the settlement agreement use exactly the same language in the same context to describe the loss requirement. Just like under the individual economic loss framework at issue in West, the framework for startup businesses such as Johnson Brothers determines a claimant's compensation by comparing the difference between the claimant's expected profit and loss and actual profit and loss. Similarly, the claim form that a claimant submits in an individual economic loss claim or a startup business economic loss claim contains the same language in the same context. The claim form that David West signed states that it is for individuals who have experienced losses caused by the spill. And the claim form that Johnson Brothers signed states the startup business economic loss claim is for businesses who prove economic loss as a result of the spill. So while yes, it's true that individual economic loss claims are addressed in a different section of the settlement agreement, all the terms of the settlement agreement and claim forms that the West court relied on are equally present and applicable in the business economic loss context. There is simply no reason for this court to treat businesses differently than individuals when it comes to the loss requirement. And on the related issue of attestation, under this court's precedence, including Deepwater Horizon 3, each and every claimant must plausibly attest to a loss caused by the spill. And in the same two recent decisions, the foundation case and the basketball team case, this court specifically ordered an assessment of the claimant's attestation under the standards set by this court in West and Electrical Transformers. Again, importantly, the court stressed that when the district court denied review of the attestation issue, the court did not have the benefit of West and Electrical Transformers. All the same is true here. Even if Johnson Brothers could establish some loss within the meaning of West, some unexpected diminution in earnings, which it can't, its attestation that its loss was caused by the spill is at a minimum suspicious. Johnson Brothers entered into a contract for $51 million and received every penny of that $51 million. It completed its project on time. The only reason its revenues varied was because it completed more work toward the end of the contract. Because of the spill? They haven't made that argument, that that's the reason why the revenues changed. And even so, that's not the type of loss that the settlement agreement is supposed to compensate. It's all $51 million. Why did they have to spend extra money, thereby losing profit, to finish the bridge on time? Again, we don't know that that's the case. That's an assertion that they've made on appeal. The claims investigator hasn't looked at it. And we think that even with that assertion, this attestation is at a minimum implausible. I mean, West made a similar argument. He made the argument that, well, if it weren't for the spill, maybe I would have gotten a lucrative contract extension. Who knows? And the court just rejected that, said that you got everything that you were entitled to. West had expenses, too. He had, you know, costs that conceivably could have been affected by the spill. But he entered into a contract for a fixed amount and received everything that he was entitled to under that amount. And this court, in two recent cases, has said that in those circumstances, the appropriate thing is to send it back to the district court, who can then decide whether to send it to the claims administrator or not. The district court hasn't even made that threshold of termination here because it didn't have the benefit of West or electrical transformers at the time. Off-topic question. How many more of these cases are there? Not many. So I've been told that there are between 20 and 30. So, you know, of hundreds of thousands of claims, we're certainly winding down. That being said, when our people leave, I promise, every time I have a sitting, there's at least one beep. 20 to 30 left. You know, I expect... At what stage? At all stages. So from the CSSP up to the Fifth Circuit, all stages. Now, you know, one argument that opposing counsel could make is, well, if there are only 20 claims left, why bother? But these are some of the biggest ticket claims, and they're claims that go to the heart of the settlement program. You know, how does this court have Article III jurisdiction over these claims? One of my colleagues argued an attestation case yesterday with $77 million at stake. And there are three or four cases left, raising attestation issues at least, each worth millions of dollars. So this remains an important issue, an important issue to the administration of the settlement agreement. And all we ask is that this court do what it's done twice in the last few months, and reverse and remand and give the district court an opportunity to take another look at these suspicious claims. Thank you. I reserve the balance. May it please the Court. Andrew Vickney with Shields Mott on behalf of the Clayman Johnson Brothers. I think this case, after listening to opposing counsel, comes down to whether this claim is implausible or suspicious. I have not seen anything that makes this claim suspicious or implausible. The standards set out in all these recent cases, you have the Howard Transformers, is maybe we should investigate further if the attestation is implausible. Well, what makes something implausible? Well, this case is clearly different than a lot of those other cases, and I'll tell you specifically why. We're talking about Johnson Brothers, and a little background about Johnson Brothers. As they admitted, it's a contractor building the bridge to get from the mainland of Louisiana onto Grand Isle. They start work in 2009 before the spill. $51 million project. The site is located on the island. They do their staging operations, which is where you kind of get ready and start the process, on the island side of the project right by the bridge. BP spill happens. What happens next? Well, all the cleanup operations going on in Grand Isle take over the staging operations, and in, I think the record page is 755, we were asked some questions and we advised them. They took over our staging area. Not BP, but one of the cleanup operations, one of those companies took over the staging area. So what happens to a contractor when somebody takes over staging? And we're not talking about building a house where you've got to move your sawhorse from one end of the lot to the other. We're talking a $51 million project involving 100-foot concrete pilings. You order materials based on where you plan to start and where you plan to finish. So when they take over the staging area, Johnson Brothers just can't sit back and say, I'll ask the state of Louisiana for a contract extension because it doesn't happen. So what happens? Well, the schedule has to change. There's inefficiencies, and they're delayed. And when I say delay, it doesn't mean necessarily that they did not finish the project on time. It just means that at some point further down the line, they have to take action to make up for that delay. Whether it's, now we've got to start working overtime, Saturdays, Sundays, more than eight hours a day. All that costs money. Now we have to accelerate, which is speed up the pace, so we can meet the deadline. And that's what happened. So how can a construction contractor in Grand Isle, where the cleanup operations are taken, how can a loss associated with the spill be implausible? It's not. It's reasonable. Now the standards don't say, well, if you think it's implausible, now you have to go further and investigate. This court and other precedents in Deepwater Horizon 3, the Policy 495 decision, and the transformer case all make it clear. BP made a contractual concession in the settlement agreement when they agreed, okay, we're not going to require people to put on trial type evidence to establish their loss. They're going to sign an attestation, and then the proof of loss will basically count as causation. Well, the loss is determined by the specific formulas in the settlement agreement. No claimant has to go and provide evidence that they suffered a loss. The loss is determined by the settlement agreement. If I was actually in trial, the evidence that I would have to put on from a construction delay matter would involve experts. It would involve a ton more evidence. We actually filed suit before the settlement agreement, and I want to say it's on record page 309. We identified the suit we filed in the Eastern District. So the settlement process comes along and my client says, you know, I'd rather opt into the settlement. So we do. Now under this settlement, we only have to provide certain guidelines to establish the claim. That's what we did. We are start-up business economic loss. Exhibit seven establishes the framework under what our loss is. That's exactly what we did. Now this going back and forth about how we never... There is a number. Excuse me, sir? There is a number attached to what the loss is. No, there is no, you don't provide a number. They ask you... You know, maybe it's a secret, but if you're telling me you sat down and you took a case with no idea how much money was involved or may be involved in it, you just took it. Oh, no. So the formula, so you're admitting that the formula could result in you getting nothing. Result in getting nothing? In your client getting nothing. The formula could result in that. It's possible. I mean, we evaluate that before we make that decision. Did I know what the number is? It's in the neighborhood of two to three million dollars. It depends on experts and their thoughts. Now, when we submit the claim to the... I just wanted to be sure everybody's walking... We're taking up all this time blindly because nobody knows. And I've had another one of these BP cases where neither side really knew what they were fighting about. They were just fighting. I mean, literally I asked them and they just didn't know. So maybe nobody knows here what you're really fighting about, but you guys are really fighting hard. No, no, no. The award in this matter, when they say the ultimate award is 2.4 million, the award is made up of a compensation amount. In this case, it was 980-something thousand dollars. Now, because you have this risk multiplier, we were located in zone A, so what the settlement agreement does is it takes that number and multiplies it times one and a half and adds it to the 900,000. That's how you come up with 2.4 million. Now, in the settlement program, you fill out the claim form and then you provide the information. They determine the loss. If you dispute their calculation, then you can go back and forth. The settlement agreement doesn't require you to put on trial-type evidence. Understand all of that. I'm not asking you what the settlement agreement requires. I'm just trying to figure out if y'all know what the argument is about. He stood up and told me about all these other cases, 77 million, all of that. But this one, we don't know what the money is. It's what I'm hearing from everybody. But apparently we know. The value is 980,000 and the multiplier comes up to 2.4 million. Now, I want to take some time to go over these cases. The David West case is an anomaly. It's an extreme situation which is clearly different from the claimant here, Johnson Brothers. They were building a bridge and construction was interrupted. It's clearly distinguishable from a basketball player. Now, the foundation case was sent back because it specifically dealt with a split among appeal panels as to whether that nonprofit foundation was just a flow-through entity or not. So it was remanded back. The basketball team owner specifically dealt with accounting issues. The sale of a draft pick was classified as a negative salary expense and some regular expenses were classified as fixed versus variable. So you had those accounting issues that resulted in it being remanded back. We don't have any accounting issues here. We don't have any split in the appeal panels. It's all based on the attestation is implausible and it's implausible because we received the entire value of the contract. They're trying to equate revenue with profit. It's not the same thing. While we did receive the entire value of the contract, that has no bearing or makes no determination on whether or not we lost profit because we had to incur further expenses down the line. It's all based on revenue. And the fact that the revenue started to decrease at the end, the lost compensation period is outside of the decrease in revenue. We were prevented from normally constructing the project because of the delay. Is that tied to a loss related to this bill? Absolutely it is. The fact that David West and the transformer case say, well, if we think it's suspicious, you should look at it. Judge Barbier had the facts. He knows. If you look at 755, we tell the appeal panel that our staging area was taken over. The cases that have been remanded back are clearly distinguishable. Our position is that this is not an implausible claim. Because it is not implausible, there is no basis to send it back. And we respectfully request that you guys affirm this report. Thank you, Mr. Victor. Thank you. Mr. Robinson, you have five minutes on rebuttal. Thank you. Just a couple of points on rebuttal. Judge Graves, I think the question that you were asking, which I didn't hear an answer to, was what was your loss in the real world as you think it was, based on the extra costs that you say you had. And I didn't hear an answer. I haven't seen an answer in anything in the record. And the reason I suspect we haven't seen an answer is that it would make no sense if you look at the claimant's profit and loss statements. You see that their expenses were lower in the period after the spill. So the only factor driving this award was the fact that revenues increased over the course of the project. Because as they were nearing completion, they were doing more work. The way this contract worked was an engineer for the state of Louisiana would see how much work was done every month and then estimate how much should be paid. So their revenues went up toward the end. And just under the formulas, they just look at two variables. One of them is revenue and one of them is variable expenses. And the revenue numbers went up. And that's why there was a compensation amount under the settlement agreement. But that doesn't mean there's an actual real world loss within the meaning of West. And for the same reason, it means that their attestation is at a minimum suspicious, just as suspicious as the attestations that this court sent back to the district court for consideration after West and electrical transformers. Council made the argument that BP has contracted away causation. This court has held that BP contracted away causation. We're not contesting causation. But, you know, this court has also said that in the rare few cases where there is a suspicious or implausible attestation or evidence of a sole superseding cause, the claims administrator does serve a gatekeeping function. And how the claims administrator goes about doing that function can be resolved just as the claims administrator resolves any other issues that come before it. But in an unusual situation like this, like West, where you have a business whose whole business this was one trailer, whose whole business was this one contract, and the business received everything it was entitled to under the contract, that at a minimum warrants just the question being asked. What was your loss? Explain to us. How did you suffer a loss as a result of the spill? No one has asked Clayman that question. And the foundation case and basketball case, this court said that question at a minimum needs to be asked. And with that, we'd ask that the court reverse and remand. Thank you.